UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FRED HOLBROOK et al.,                              Case No. 08-12179

        Plaintiffs,                              HONORABLE SEAN F. COX
                                                   United States District Judge
v.

GENTEK, INC.,

        Defendant.
_____/

OPINION & ORDER DENYING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT [Doc. No. 64] AND GRANTING
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT [Doc. No. 52]

      Plaintiffs Fred Holbrook, John Waller, Frank Jackson, Lucas Rosas Villa, Alan Herster,

and Jeffrey Buck ("the Plaintiffs") filed this action on October 28, 2009, alleging breach of

contract claims against GenTek, Inc. ("GenTek") for failure to pay employment incentive

bonuses. The matter is before the Court on the parties' cross-motions for summary judgment

[Doc. Nos. 52, 64]. The parties have fully briefed the issues, and a hearing was held on June 24,

2010. For the reasons that follow, the Court **DENIES** Gentek's motion [Doc. No. 64], and

**GRANTS** the Plaintiffs' motion [Doc. No. 52].

BACKGROUND

      GenTek is a holding company, organized under the laws of the state of Delaware, and

owns a number of subsidiaries operating manufacturing and performance chemicals facilities

throughout North America. Prior to its February 16, 2007 sale to another company, Noma

Company ("Noma") was one of GenTek's wholly-owned subsidiaries, was headquartered in

Westland, Michigan, and consisted of an extrusion business and a wire harness business which

1

produced wire harnesses for appliances and automobiles. [Redmond Dep., Pl.'s Ex. I, Doc. No. 52, pp.38-39].

William Redmond ("Redmond") was CEO of another of GenTek's wholly-owned subsidiary manufacturing corporations - GT Techonolgies - and since May 2005 had served as President, CEO and a Director of GenTek. *Id*. at 11. Redmond first became a director of GenTek in November of 2003, and was Chairman of GenTek's Board of Director's Compensation Committee from November 2003 until May 2005. *Id*. at 17, 19. In that role, Redmond had significant experience and knowledge about drafting compensation plans, and was directly involved in drafting the Contracts at issue in this case. *Id*. at 85, 45.

Robert Novo ("Novo") was hired as GenTek's VP of Human Resources in July of 2003. [Novo Dep., Pl.'s Ex. L, Doc. No. 52, p.7]. From 2003 to 2007, Novo regularly attended meetings of GenTek's Compensation Committee and its quarterly Board of Directors meetings. *Id*. at 12-13. Novo was also involved in the creation of the Contracts at issue in this matter.

At all times relevant to this lawsuit, and through its February 16, 2007 sale to another company, the Plaintiffs were all executives of Noma.[1]

---

[1] Fred Holbrook ("Holbrook") was initially hired by GenTek in January of 2001, and last held the position of Noma's Director of Purchasing. [Holbrook Dep., Pl.'s Ex. K, Doc. No. 52, pp.14-15]. John Waller ("Waller") was initially hired by GenTek in September of 1998, and last held the position of Director of Operations for Asia and Mexico. [Waller Dep., Pl.'s Ex. L, Doc. No. 52, pp.9-10]. Frank Jackson ("Jackson") was initially hired by GenTek in the mid-1990s, and last held the position of Director of Engineering for Noma. [Jackson Dep., Pl.'s Ex. M, Doc. No. 52, pp.10-11]. Lucas Rosas Villa ("Villa") was initially hired by GenTek in 1999, and last held the position of Plant Manager for one of Noma's Mexico plants. [Villa Dep., Pl.'s Ex. N, Doc. No. 52, p.10]. Jeffrey Buck ("Buck") was hired by GenTek in April 2006, and last held the position of Vice-President of Sales and Engineering for Noma. [Buck Dep., Pl.'s Ex. O, Doc. No. 52, pp.19-20]. Alan Herster ("Herster") was hired by GenTek in 2000, and last held the position of Account Manager for Noma. [Herster Dep., Pl.'s Ex. P, Doc. No. 52, pp.12-14].

GenTek's Bankruptcy and Executive Retention Package Initiatives

In early 2003, GenTek sought Chapter 11 bankruptcy protection and subsequently

emerged from bankruptcy that same year, in November of 2003. [Redmond Dep., pp.40-41].

During reorganization, GenTek's creditors approved GenTek's "Key Employee Retention Plan"

in an effort to retain and reward GenTek's executive employees upon GenTek's emergence from

bankruptcy. Those goals were embodied in the "GenTek Inc. 2003 Managers and Directors

Incentive Plan" ("the Plan"), which was designed to attract and retain qualified and competent

executives.[2] The Plan was drafted by outside counsel, and was approved by GenTek's Board of

Directors in late 2003 or early 2004. [Redmond Dep., p.43].

> The Plan contained several defined terms, including the following:
>
> "Company" means "Reorganized GenTek" (as defined in the Plan or
> Reorganization) or any successor thereto.
>
> "Plan of Reorganization" means the August 28, 2003 Joint Plan of Reorganization
> of the Company and certain Subsidiaries of the Company, *including Noma
> Company*, under Chapter 11 of the Bankruptcy Code. . . .
>
> "Subsidiary" means any corporation or entity (other than the Company) in any
> unbroken chain of corporations or other entities, beginning with the Company. . . .

[The Plan, Pl.'s Ex. A, Doc. No. 52, §1, pp.2-3 (emphasis added)]. Thus, under the Plan, "the

Company" was specifically defined to include Noma - and thus to include the executives of

Noma, such as the Plaintiffs in this action.

---

[2] "The purpose to the Plan is to encourage and enable the officers, employees, and directors of the Company. . . and its Subsidiaries. . ., upon whose judgment, initiative and efforts the Company largely depends for the successful conduct of its business, to acquire a proprietary interest in the Company. It is anticipated that providing such persons with a direct stake in the Company's welfare will assure a closer identification of their interests with those of the Company, thereby stimulating their efforts on the Company's behalf *and strengthening their desire to remain with the Company*." [The Plan, Pl.'s Ex. A, Doc. No. 52, § 1].

The Plan outlines a "Performance Share Award" program, which provided for awards of stock grants, stock options, and/or cash payments to executives upon the meeting of certain performance targets for the company. [*See* the Plan, §§8(a)-(c)]. As required by the Plan, GenTek's Compensation Committee, along with Novo as VP of Human Resources, established performance goals and drafted documents for the Performance Share Award program and began the process of determining which employees would be offered to become participants in the program. [Novo Dep., p.72, 79, 88; Redmond Dep., p.37, 52].

Novo and Redmond identified target employees - including the Plaintiffs - who would be offered agreements under the Plan in early 2004, and sent "notice" letters to those executives in mid-March of 2004. [Redmond Dep., p.92]. On or about June 29, 2004, GenTek distributed the final agreements ("the Contract") to the selected participants along with a form cover letter instructing the executives to sign the Contract and return it to GenTek. [Novo Dep., p.89]. Each of the Plaintiffs executed the Contract sent to them, and returned it to GenTek.[3]

The Terms of The Contracts Between GenTek and the Plaintiffs

The Contracts' recitals state that the agreement is between Gentek, Inc. - referred to in the Contract as "the Company" - and each individual executive - referred to as "the Executive." Section 1 of the Contract is a definitions section, and states that any capitalized terms not included within that definitions section shall be defined as they were used in the Plan:

    1. <u>Definitions</u>. Capitalized terms used in this Agreement, which are not defined

---

[3] The Contracts signed by each of the Plaintiffs are identical, save for the executive's name and the amount of his Performance Cash Award, which is written in bold letters in Section 2 of the Contract. For ease of reference, the Court will only refer to the language included in, and cite to, Mr. Waller's Contract [Pl.'s Ex. B, Doc. No. 52] when discussing the terms of the Contracts. Again, all relevant contractual language was the same in each of the Plaintiffs' Contracts. The remaining Plaintiffs' actual contracts appear as Exhibits C-G to Plaintiff's motion for summary judgment [Doc. No. 52].

herein or on Exhibit C, shall have the meaning given such terms in the Plan.

[Waller Contract ("the Contract"), Pl.'s Ex. B, Doc. No. 52, §1]. The term "the Company" is

used throughout the Contract, but is not included as a defined term in the Contract - though, as

described *supra*, "the Company" is defined within the Plan to include all subsidiary corporations

of GenTek, including Noma Corporation.

Section 2 of the Contract establishes the eligibility criteria for each Plaintiff to receive

their respective "Performance Cash Awards." That section states as follows, in pertinent part:

> The Executive is eligible for a Performance Cash Award with a target value of the
> [the amount differs with each executive] ("the Target Award"). The actual
> amount of the Performance Cash Award will be determined by the level of
> achievement of the Cumulative EBITDA Target and the Average Return on
> Assets Target ("the Performance Cash Amount") for the period beginning on
> January 1, 2004, and ending on December 31, 2006 ("the Performance Period").
> Each of the two metrics shall be equally weighted. If the Company achieves
> greater or lesser than 100% of the Cumulative EBITDA Target or the Average
> Return on Assets Target, the Performance Cash Award Amount will increase or
> decrease as set forth in the attached Exhibit A.

*Id*. at §2. Further, the Contracts define the terms "Cumulative EBITDA," "Cumulative EBITDA

Target," and "EBITDA" as follows:

> c. "Cumulative EBITDA" shall mean, as of December 31, 2006, the total
> EBITDA for the period of between January 1, 2004 though December 31, 2006.
>
> d. "Cumulative EBITDA Target" for a given period shall be set forth on Exhibit
> B to this Agreement, subject to Section 8, and shall equal the arithmetic average
> of the EBITDA Targets for the 2004, 2005 and 2006 calendar years.
>
> e. "EBIDTA" means for any applicable period the sum of (i) the new income *of
> the Company and its consolidated Subsidiaries* for such period plus (in each case
> to the extent included in the calculation of such net income) the sum of (x) all
> income taxes (whether paid or deferred), (y) interest expense (net of any interest
> income), and (z) amortization and depreciation expense. This figure shall be
> exclusive of material, one-time, non-recurring charges.

*Id*. at §1(c)-(e) (emphasis added). Thus, the Contracts lay out a procedure for paying

Performance Cash Awards to the Plaintiffs based, in part, off of *the new income of the Company and its consolidated Subsidiaries*.

Under their individualized Contracts, GenTek established the following figures as the base amount for each Plaintiffs' Performance Cash Award:

| | |
|---|---|
| Holbrook: | $37,500.00 |
| Waller: | $57,500.00 |
| Jackson: | $18,7500.00 |
| Villa: | $30,000.00 |
| Herster: | $22,500.00 |
| Buck: | $37,500.00 |

[Pl.'s Exs. B-G, Doc. No. 52, §2].

The Instant Litigation

Upon conclusion of the Performance Period - January 1, 2004 through December 31, 2006 - GenTek's EBITDA exceeded the $197.7 million target set forth in Exhibit B to Plaintiffs' Contracts. [*See* Pl.'s Ex. I; Redmond Dep. at 161]. Specifically, GenTek achieved an EBITDA of $251.9 million, which was 127.41% of the $197.7 EBITDA target. [*See* GenTek Press Releases dated March 16, 2006, March 20, 2007, and March 17, 2008, Pl.'s Exs. T-V, Doc. No. 52]. At this level - above 125% of the Target EBITDA - Exhibit A to Plaintiffs' Contracts states that the Plaintiffs are due 150% of their target Performance Cash Awards, which equates to the following amounts due each Plaintiff:

| | Base Rate | 150% Base Rate |
|---|---|---|
| Holbrook: | $37,500.00 | $56,250.00 |
| Waller: | $57,500.00 | $86,250.00 |
| Jackson: | $18,750.00 | $28,125.00 |
| Villa: | $30,000.00 | $45,000.00 |
| Herster: | $22,500.00 | $33,750.00 |
| Buck: | $37,500.00 | $56,250.00 |

[*See* Pl.'s Br., Doc. No. 52, p.22]. To date, GenTek has not paid any monies owed pursuant to

either the Plan or the Contract to the Plaintiffs.

The Plaintiffs filed this action on May 19, 2008 [*see* Doc. No. 1], and filed their First Amended Complaint on October 28, 2009 - asserting a single cause of action for breach of contract against GenTek. [*See* Doc. No. 40].

The parties have each filed cross-motions for summary judgment [*see* Doc. Nos. 52, 64], in which the parties concede that Delaware contract law controls the issues of the case, and that the Contracts' terms are plain and unambiguous - the parties merely dispute the meaning of the Contracts' terms. The issues are therefore ripe for adjudication as a matter of law.

## STANDARD OF REVIEW

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgement as a matter of law." FED. R. CIV. P. 56(c). The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting FED. R. CIV. P. 56(e)).

## ANALYSIS

Both parties' cross-motions for summary judgment make arguments regarding interpretation of the Contracts as a matter of law. As the Contracts contain a Delaware choice-

7

of-law clause [*See* Pl.'s Ex. B, Doc. No. 52, §10], the Court will apply Delaware's body of contract law to the dispute between the parties.

Under Delaware law, "[t]he determination of whether a contract is ambiguous is a question for the court to resolve as a matter of law. Summary judgment is an appropriate process for the enforcement of unambiguous contracts because there is no material dispute of fact for the court to resolve." *Comet Sys., Inc. Shareholder's Agent v. MIVA, Inc.*, 980 A.2d 1024, 1030 (Del. Ch. 2008). Therefore, the threshold inquiry when presented with a contract dispute on a motion for summary judgment is whether the contract is ambiguous. *See United Rentals, Inc. v. RAM Holdings, Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007).

If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract, or to create an ambiguity." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. Super. 1997). Further, ambiguity does not exist simply because the parties disagree about what the contract means. *Am. Legacy Found. v. Lorillard Tobacco Co.*, 886 A.2d 1, 20 (Del. Ch. 2005). To the extent any ambiguity does exist, Delaware courts apply "the well-accepted *contra proferentum* principle of construction which is that ambiguities in a contact should be construed against the drafter." *Nelson v. Kamara*, 2009 WL 1964788, *1 (Del. Super. 2009) (internal citations omitted).

I. Gentek's Motion for Summary Judgment [Doc. No. 64].

In its motion [Doc. No. 64], Gentek makes two primary arguments: 1) that, as the Plaintiffs were never employed by "the Company," as defined in the Contracts, GenTek does not owe Performance Cash Awards to the Plaintiffs [*see* Doc. No. 64, pp.3-5]; and alternatively 2) that the Performance Cash Awards must be reduced by 50% under the terms of the Contracts

[*see* Doc. No. 64, pp.5-7]. As neither of these arguments have merit, the Court **DENIES**

GenTek's motion for summary judgment [Doc. No. 64].

A. The Plaintiffs and their Employment by "the Company."

GenTek argues that, under the plain language of the Contracts, the Plaintiffs are not

entitled to the Performance Cash Awards because they were never employed by "the Company,"

which GenTek argues does not include its subsidiaries:

> Plaintiffs, as a matter of law, are not eligible to receive the Performance Cash
> Awards because the undisputed evidence establishes that they were not employed
> by GenTek when the Performance Cash Awards were to be paid.

[Def.'s Br., Doc. No. 64, p.3]. The Court disagrees.

GenTek's argument relies primarily upon the introductory, "recitals" section of the

Contracts in support of its arguments. Specifically, one of the Contracts' recitals states as

follows:

> WHEREAS, all capitalized terms *used herein* without definition shall have the
> meanings ascribed to such terms in the Plan.

[The Contract, Pl.'s Ex. B, Doc. No. 52, p.1 (emphasis added)]. Section One of the Contracts

then defines several terms used within the Contracts, and begins with the following clause:

> 1. Definitions. Capitalized terms used in this Agreement, which are not *defined
> herein* or on Exhibit C, shall have the meaning given such terms in the Plan.

*Id*. (emphasis added). Though the Contracts use the term "Company" throughout, the word

"Company" is not defined within the Contracts' definitions section, nor is it defined on Exhibit C

to the Contracts.

Section Three of the Contracts requires that the Plaintiffs must be employed by "the

Company" on the date the Performance Cash Awards were to be paid - if the Plaintiffs were not

9

employed by "the Company," on that day, the Plaintiffs would forfeit the Performance Cash

Awards:

> The Company shall determine the amount of performance cash earned by the
> Executive and shall pay to the Executive the Performance Cash Award Amount
> within 30 days of calculating such amount *provided that the Executive's* [*sic*] *is*
> *still employed by the Company on the date of the Performance Cash Award*
> *Amount is paid*.

*Id*. at p.2.

Though the Plan defines "the Company" as "Reorganized GenTek" - which is further

defined to include GenTek's subsidiary corporations - GenTek argues that the Plan cannot be

consulted in defining "the Company" due to the Contracts' opening recital:

> THIS AGREEMENT is made by and between GenTek Inc., hereinafter referred
> to as the "<u>Company</u>," and [Plaintiff's Name], hereinafter referred to as
> "<u>Executive</u>," effective as of the date signed by the Executive.

*Id*. at p.1.  GenTek elaborates on their argument as follows:

> Plaintiffs have not proved that they were employed by GenTek, "the Company,"
> at the time the Performance Cash Awards were to be paid. . . . Thus, under
> Plaintiffs' own interpretation of the Agreements, they are not entitled to
> Performance Cash Award Payments because they were not employed by GenTek
> when the awards were paid.

[Def.'s Br., Doc. No. 64, p.4].

This argument is without merit for several reasons.  First, the Contracts' first recital does

not actually purport to *define* "the Company."  Rather, the Contracts simply states that, for

purposes of these documents, the parties will simply substitute "the Company" as a placeholder

notation for GenTek and its subsidiaries.

Further, GenTek's argument is entirely dependant upon the Contracts' "whereas" clauses

stating that "all capitalized terms *used herein* without definition shall have the meanings ascribed

to such terms in the Plan." [Pl.'s Ex. B, Doc. No. 52, p.1 (emphasis added)]. This phrase "used

herein" directly conflicts with Section One of the Contracts:

> Capitalized terms used in this Agreement, which are not *defined herein* or on
> Exhibit C, shall have the meaning given such terms in the Plan.

*Id*. Delaware law is clear that, for purposes of interpreting a contract, recitals clauses in conflict

with a contract's substantive provisions must yield to those substantive provisions:

> Recitals are not a necessary part of a contract and can only be used to explain
> some apparent doubt with respect to the intended meaning of the operative or
> ganting part of the instrument, and if inconsistent with clear and definite language
> in the granting part the latter will prevail.

*Stabler v. Ramsay*, 62 A.2d 464, 470 (Del. Ch. 1948) (reversed on other grounds). Here, the

Contracts' first section *requires* that capitalized terms be defined within that section - or on

Exhibit C - and if not so defined, the Contract directs the Court to the Plan for the definition of

any other capitalized terms. "Company" is a capitalized term, and it does not appear as a defined

term under either Section One's definitions or on Exhibit C. Under Delaware law, therefore, the

recitals clause relied upon by GenTek in support of its argument must yield in favor of the

Contracts' first clause in Section One.

Finally, construing the phrase "the Company" as argued by GenTek would lead to absurd

results obviously contrary to the intent of the parties at the time the Contracts were signed. As

GenTek argues, the Contracts state that the contemplated granting of Performance Cash Awards

to the Plaintiffs was only to occur "provided that the Executive's [*sic*] is employed by the

Company on the date. . . ." *Id*. at p.2. The Contracts further state that the Performance Cash

Awards were being granted "in partial consideration of services rendered, or to be rendered, *to

the Company* and as an incentive for *increased efforts during such service*. . . ." *Id*. at p.1. As

11

both parties concede, however, *the Plaintiffs were never employed directly by GenTek* - rather,

they were all employed by Noma Corporation, one of GenTek's subsidiaries.  Knowing that the

Plaintiffs were *not* employed directly by GenTek, and reciting that the Performance Cash

Awards were being given for the Plaintiffs' efforts on behalf of "the Company," the parties

simply could not have intended to condition Plaintiffs' receipt of the Performance Cash Awards

upon an impossibility - i.e., continuing to work for a company the Plaintiffs *did not work for to

begin with*.  GenTek's arguments to the contrary are without merit.

> B.  One-Half Reduction of Plaintiffs' Bonuses.

The second and final argument advanced by GenTek in support of its summary judgment

motion relates to the language in Section Two of the Contracts, which states as follows, in

pertinent part:

> The actual amount of the Performance Cash Award will be determined by the
> level of achievement of the Cumulative EBITDA Target and the Average Return
> on Assets Target (the "Performance Cash Award Amount") for the period. . . .
> Each of the two metrics shall be equally weighted.  If the Company achieves
> greater or lesser than 100% of the Cumulative EBITDA Target *or* the Average
> Return on Assets Target, the Performance Cash Award Amount will increase or
> decrease as set forth in the attached Exhibit A.

[Pl.'s Ex. B, Doc. No. 52, p.2 (emphasis added)].  GenTek argues that this clause requires *both*

the Cumulative EBITDA Target and the Average Return on Assets Target to be met before

100% of the Performance Cash Award was paid out:

> Thus, both EBITDA *and* Return on Assets amounts would be considered, equally,
> in determining the actual amounts of Plaintiffs' Target Awards.  Under the
> Agreements, EBITDA and Return on Assets targers would each carry a 50
> percent weight.  Thus, participants were required to exceed both the EBITDA *and*
> Return on Assets targets to receive payment of 150 percent of the Target Awards.

[Def.'s Br., Doc. No. 64, p.6 (internal citations omitted) (emphasis added)].  As Plaintiffs have

offered no evidence regarding GenTek's Return on Assets Targets being met for the period in question, GenTek argues, the Court must reduce the Plaintiffs' Performance Cash Awards by half. *Id*. at 7.

The Court disagrees. As the Plaintiffs argue in their response brief, GenTek's argument ignores the plain language of the Contracts stating that *either* of the metrics used - Cumulative EBITDA *or* Return on Assets Target - can affect the Performance Cash Awards *as described in Exhibit A to the Contract*s:

> Specifically, the Agreements state, "[i]f the Company achieves greater or lesser than 100% of the Cumulative EBITDA **or** the Average Return on Assets Target, the Performance Cash Award Amount will increase or decrease as set forth in the attached Exhibit A." **GenTek's response breif completely ignores this language**.

[Pl.'s Br., Doc. No. 70, p.8 (emphasis in original)].

Further, Exhibit A to the Contracts also makes it clear that the Performance Cash Award recipient is entitled to 150% of his or her award upon GenTek's achievement of the cumulative EBITDA targets. [*See* Ex A. To Pl.'s Ex. B, Doc. No. 54]. As can be seen from Exhibit A to the Contracts, GenTek's hitting 125% of Cumulative EBITDA entitles the Plaintiffs to 150% of their Target Award. That Plaintiffs do not come forward with evidence regarding GenTek's Average Return on Assets Target is immaterial - under the Contracts' plain language, GenTek's Cumulative EBITDA alone entitles the Plaintiffs to 150% of their Performance Cash Awards. GenTek's arguments to the contrary are without merit.

For these reasons, the Court **DENIES** GenTek's motion for summary judgment [Doc. No. 64] in its entirety.

II. The Plaintiffs' Motion for Summary Judgment [Doc. No. 52].

13

In their motion [Doc. No. 52], the Plaintiffs argue that they are entitled to Performance

Cash Awards at 150% of their Target Award amounts pursuant to the Contracts.  In opposition,

GenTek argues that there is a unilateral mistake in the Contracts - that EBITDA was not

supposed to be calculated on GenTek *as a whole*, but rather only for the specific subsidiary

entities:

> Plaintiffs' argument that the EBITDA and Return on Assets targets in their
> Agreements applies to GenTek as a whole, and not the manufacturing segment, is
> based on the definitions of "EBITDA" and "Company" contained in the
> Agreements.  As high-level management employees with knowledge of the
> manufacturing segment's and GenTek's financial status, there is a genuine issue
> of material fact regarding whether Plaintiffs knew or should have known the
> definitions contained in the Agreement were a mistake.  The absurdity of
> Plaintiffs' argument is that GenTek's historic EBITDA was at least *double* the
> EBITDA amounts listed as targets in the Agreements. . . . In Plaintiffs' world,
> they are entitled to performance cash awards, potentially ranging from a low of
> $28,125 to a high of $135,000, as long as GenTek's EBITDA did not *decline* by
> more than fifty percent.

[Def.'s Br., Doc. No. 66, pp.2-3 (emphasis in original)].  As the *entirety* of GenTek's argument

in opposition to the Plaintiffs' motion [Doc. No. 52] hinges upon this unilateral mistake

argument, the Court will deem the remainder of Plaintiffs' arguments admitted for purposes of

this motion.  Therefore, the Plaintiffs are entitled to summary judgment on their contractual

claims unless a genuine issue of material fact exits regarding a unilateral mistake in the

Contracts.  Because GenTek's purported "unilateral mistake" defense fails on its merits, the

Court **GRANTS** Plaintiffs' motion for summary judgment [Doc. No. 52].

Under Delaware law, a court may reform a contract to make it conform to the original

intent of the parties.  *Waggoner v. Laster*, 581 A.2d 1127, 1135 (Del. 1990).  Contract

reformation is appropriate where there is *clear and convincing evidence* that the contract does

not represent the parties' intent because of a unilateral mistake coupled with knowing silence of

the other party. *Collins v. Burke*, 418 A.2d 999, 1002 (Del. 1980).

As the party asserting the doctrine of unilateral mistake, GenTek must show through *clear and convincing evidence* that it was mistaken and that the Plaintiffs knew of the mistake but remained silent. *See, e.g., Cerbreus Intern., Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141 (Del. 2002). If that test is met, the Court may rescind the Contracts if: 1) enforcement of the agreements would be unconscionable; 2) the mistake relates to the substance of the consideration; 3) the mistake occurred regardless of the exercise of ordinary care; and 4) it is possible to place the other party in the *status quo ante*. *Matter of ENSTAR Corp.*, 604 A.2d 404, 411 (Del. 1992); see also *American Bottling Co. v. Crescent/Mach I Partners, L.P.*, 2009 WL 3290729, *4 (Del. Super. 2009).

In opposing GenTek's unilateral mistake defense, the Plaintiffs argue that GenTek "cannot satisfy the first - unconscionable; third - ordinary care; and fourth - status quo, of these elements." [Pl.'s Reply, Doc. No. 68, p.4]. The Court agrees.

        A. Unconscionability.

GenTek argues that allowing the Plaintiffs to collect Performance Cash Awards under the circumstances of this case would be unconscionable - the first of the four requirements under Delaware law for reformation or rescission of a contract. [*See* Def.'s Br., Doc. No. 66, pp.4-9]. The Court disagrees.

Under Delaware law, the traditional test used for unconscionability is whether the agreement is "such as no man in his senses and not under delusion would make on the one hand, and as no honest or fair man would accept, on the other." *American Bottling*, 2009 WL 3290729, *4. GenTek argues that the facts of this case meet this requirement:

Here, GenTek would not make an agreement to provide substantial cash bonuses for a *decline* in the company's financial performance. Further, Plaintiffs cannot contend honestly and fairly that they believed GenTek would enter into such an agreement as an incentive to *increase* profits.

[Def.'s Br., Doc. No. 66, p.5 (emphasis in original)].

As the Plaintiffs argue, however, an *increase* in profits was not all that GenTek sought to accomplish through the Contracts - or even the *main* reason the Contracts were entered into for that matter. "[T]he record evidence [] demonstrates that the Plan and the Performance Cash Awards were provided to employees as an incentive to entice them to continue their employment with GenTek subsequent to its bankruptcy - not simply to award achievements. GenTek admitted this very fact by way of its Counter-Statement of Disputed Facts." [Pl.'s Reply, Doc. No. 68, p.5, citing Doc. No. 65, p.8 (internal citations omitted)].

GenTek relies primarily upon *American Bottling* in support of its argument regarding unconscionability. In that case, to resolve a shareholder appraisal action, the parties signed a settlement agreement that contained a material miscalculation by the Delaware Chancery Court as to the total amount owed to the shareholders. Enforcing the agreement with this mistake included would have led to a $3.3 million overpayment to the shareholders. Under those circumstances, the court held that enforcing the settlement would be unconscionable. *American Bottling*, 2009 WL 3290729 at *4.

This case differs from the circumstances presented in *American Bottling* prompting that court to reform the agreement. Unlike *American Bottling*, where the mistake made was attributable to the Court rather than to a party, here the alleged "mistake" was made solely by GenTek in drafting the agreement. Furthermore, the dollar amounts associated with the alleged "mistake" are significantly lower than those involved in *American Bottling*.

16

More important than the *amounts* involved in this case, however, is the fact that the

Contracts simply fall short of Delaware law's requirement that "no man in his senses and not

under delusion would make on the one hand, and as no honest or fair man would accept. . . ." *Id*.

GenTek goes to great lengths highlighting deposition testimony from the Plaintiffs speculating

that, essentially, it appears somewhat odd at first glance for a company to pay incentive bonuses

while the company is losing money. [*See* Def.'s Br., Doc. No. 66, pp.5-8]. Even if such an

agreement seems *odd* - a fact this Court does not necessarily accept as true - such does not mean

that the agreements were *unconscionable*. Indeed, as GenTek was undergoing bankruptcy

reorganization during the time in question, it is entirely possible - even likely, perhaps - that

GenTek could lose *lots* of money despite the best efforts of the Plaintiffs.

GenTek appears to have made a strategic decision that it was important to its long-term

viability to retain the Plaintiffs' services through the bankruptcy reorganization process. As

such, the Contract entered into between the parties provided for Performance Cash Awards to be

paid *even if GenTek did not hit its historical financial averages*. Nothing about these Contracts

is unconscionable as a matter of law, and the Court finds GenTek's arguments to the contrary

without merit.

        B. Ordinary Care.

GenTek also argues that the alleged mistake in the Contracts occurred notwithstanding

the exercise of ordinary care - the third of the four requirements under Delaware law for

reformation or rescission of a contract. [*See* Def.'s Br., Doc. No. 66, pp.10-11]. The Court

disagrees.

Black's Law Dictionary - relied upon by GenTek itself in advancing its argument -

defines "ordinary care" as "the degree of care that a prudent and competent person engaged in

17

the same line of business or endeavor would exercise under similar circumstances." BLACK'S

LAW DICTIONARY (8th ed. 2004). *American Bottling* found such "ordinary care" to have been

exercised where that company "relied upon experts to verify the accuracy of [the court's]

calculations prior to entering into the Settlement Agreement." *American Bottling*, 2009 WL

3290729, *4. GenTek argues that the same level of "ordinary care" was exercised in its drafting

of the Contracts:

> GenTek relied on outside counsel to draft the Agreements. Novo and Redmond
> reviewed drafts of the Agreement provided by GenTek's outside counsel, and
> were asked to offer comments about the draft Agreement. Before its adoption, the
> draft Agreement was submitted to GenTek's compensation committee for
> approval. Nevertheless, despite GenTek's due diligence, the mistake contained in
> the Agreement was not avoided.

[Def.'s Br., Doc. No. 66, p.11 (internal citations omitted)].

The Court disagrees. The Contracts clearly indicate that all capitalized terms not

specifically defined in the Contracts themselves "have the meaning given. . . in the Plan." [Pl.'s

Ex. B, Doc. No. 52, §1]. "Company" is not a term specifically defined in the Contracts, and the

Plan defines the term as "Reorganized GenTek (as defined in the Plan of Reorganization),"

which GenTek has conceded specifically includes GenTek's subsidiary corporations.

Further, even if there *was* confusion among GenTek's agents regarding whether the term

"Company" included GenTek's subsidiary corporations, the definition of EBITDA within the

Contract explicitly states that this figure is calculated by considering "the net income of the

Company *and its consolidated Subsidiaries. . . .*" *Id*. at §1(e). For GenTek to now argue that

multiple levels of senior management were otherwise incapable, despite their purported ordinary

care, to have caught this error prior to entering into the Contracts is, quite frankly, somewhat

incredible. GenTek's arguments to the contrary are without merit.

C.  Status Quo Ante.

GenTek also argues that reformation is possible in this instance because the Plaintiffs can be returned to their status *quo ante* - the fourth and final requirement under Delaware law for reformation or rescission of a contract.  [See Def.'s Br., Doc. No. 66, p.11].  GenTek's entire argument on this issue comprises a single sentence in its brief: "Further, because Plaintiffs have not lost anything as a result of the unilateral mistake contained in the Agreement, there has been no change to the Plaintiffs' status quo."  *Id*.  The Court disagrees.

In opposition to GenTek's arguments, the Plaintiffs argue as follows:

> Plaintiffs continued their employment with GenTek, at least in part, as a result of being selected to participate in the Performance Cash Award program.  Such reliance, in fact, was an expressly stated purpose of the Plan.  GenTek's assertion that "Plaintiffs' have not lost anything as a result of the unilateral mistake" is absurd.  To the contrary, Plaintiffs' "lost" the opportunity to seek and possibly gain employment outside of GenTek.  Plaintiffs cannot now be placed in the same position as they were in July of 2004; they cannot be returned to the status quo that was their respective careers, and career path, as they stood at that date.

[Pl.s' Reply, Doc. No. 68, p.6 (internal citations omitted)].  The Court agrees, and finds GenTek's arguments to the contrary without merit.

D.  The Plaintiffs' Purported "Knowing Silence."

Even assuming, *arguendo*, GenTek could meet the four-part test under Delaware law for reformation or rescission of a contract containing a unilateral mistake - a holding this Court does not reach today - GenTek must still, *clearly and convincingly*, show that the unilateral mistake was made with the "knowing silence" of the Plaintiffs.  *See Collins v. Burke*, 418 A.2d 999, 1002 (Del. 1980); *Cerbreus Intern., Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141 (Del. 2002).  GenTek has failed to come forward with such evidence in this matter - indeed, GenTek's brief does not even specifically address the Plaintiffs' alleged "knowing silence."

19

GenTek's brief in opposition - addressing the "unconscionability" requirement of the four-part test announced in *ENSTAR* and *American Bottling* - argues that the Plaintiffs *knew* that something was wrong with the Contracts when they were signed. [*See* Def.'s Br., Doc. No. 66, pp.5-8]. The deposition testimony cited by GenTek does not support this contention, however. At best, the Plaintiffs' deposition testimony evidences that the Plaintiffs might have thought it was somewhat "odd" or "strange" that the EBITDA targets were lowered from 2003 to 2004, and that rewarding the Plaintiffs for their efforts while the company's profits went down from 2003 to 2004 wasn't necessarily in line with a purported goal to increase shareholder value. These deposition quotations do not, however, *clearly and convincingly* indicate the Plaintiffs' knowing silence regarding the alleged unilateral mistake.

GenTek has failed to adequately state an affirmative defense of unilateral mistake. Granting summary judgment in Plaintiffs' favor is therefore proper.

CONCLUSION

For the reasons described above, the Court **DENIES** GenTek's motion [Doc. No. 64], and **GRANTS** the Plaintiffs' motion [Doc. No. 52].

**IT IS SO ORDERED**.


S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated: July 7, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record on July 7, 2010, by electronic and/or ordinary mail.

S/Jennifer Hernandez
Case Manager